# EXHIBIT 14



Travers Smith LLP 10 Snow Hill, London, EC1A 2AL
T: +44 (0)20 7295 3000 | www.traverssmith.com

**By Email only**

Lewis Silkin LLP
Arbor
255 Blackfriars Road
London
SE1 9AX

| | |
|---|---|
| **Our ref:** | TPG/LMA |
| **Your ref:** | MM8000/124219/1/4165-1463-9968.2 |
| **Doc ID:** | 42716087 |
| **Tel:** | +44 (0)20 7295 3000 |
| **Email:** | tim.gilbert@traverssmith.com |

9 September 2025

Dear Lewis Silkin LLP

**Our client: Jimmy Fraiture**
**Your client: X.AI London Limited ("xAI")**

**1.** We refer to: (a) your letter to Mr Fraiture dated 5 September 2025 (the "**5 September Letter**"); (b) your first letter to this firm dated 8 September 2025 (the "**First 8 September Letter**") (we note for completeness that our initial email to your firm was sent on 6 September 2025, not 7 September 2025, as stated at paragraph 1 of the First 8 September Letter); (c) our letter to you dated 8 September 2025; and (d) your second letter to this firm dated 8 September 2025 (the "**Second 8 September Letter**").

*Background*

**2.** Our client resigned from his employment with your client on 1 August 2025. The same day, your client placed our client on garden leave for the remainder of his notice period (your client then sent a letter to our client on 5 August 2025 which stated that our client was being placed on garden leave "with immediate effect"). Our client's notice period ended on 1 September 2025, being the date on which his employment with your client terminated.

**3.** Our client had decided to resign from your client's employment to take up a role that had been offered to him at OpenAI. As our client prepared to provide his notice to your client, our client considered that one possible reaction to him giving such notice could be that, immediately upon resigning, our client would have his work laptop and general

Travers Smith LLP is a limited liability partnership registered in England and Wales under number OC 336962 and is authorised and regulated by the Solicitors Regulation Authority (SRA number 489478). A list of the members of Travers Smith LLP is open to inspection at our registered office and principal place of business: 10 Snow Hill London EC1A 2AL

system access revoked, without having had an opportunity to obtain important documents belonging to him (e.g. his payslips and other employment paperwork). Having decided to provide his resignation at an internal meeting which had been arranged by his line manager for 1 August 2025, on 31 July 2025 our client copied a number of these personal documents to his personal laptop.

4. At the same time, our client also copied certain files belonging to your client, including a portion of the xAI monorepo (containing, amongst other code, code that he personally created during his tenure at xAI). Our client did not do this with the intention of providing the xAI code to his new employer, or indeed any other third party. Rather, he made a hasty and regrettable decision in the moment; he was proud of the code that he worked so hard on, and he did not want to forget it in the future.

5. As part of the above transfer, our client inadvertently also included a copy of the recording of an xAI All Hands virtual meeting. This file had been sent to his work device contemporaneously by a colleague for him to watch, as he did not attend the original meeting. To be clear, and with reference to paragraph 5(d)(ii) of the First 8 September Letter, our client did not *"take a recording of the xAI All Hands meeting"*, if your suggestion is that our client made the recording itself. He did not.

6. Soon after our client was placed on garden leave, he remembered that he had copied these files. He realised that he had made a significant mistake in doing so and deleted what he thought at the time was the total sum of the files belonging to xAI.

7. On 28 August 2025, our client received an email from your client's Insider Threat security team, requesting a meeting to discuss *"an Airdrop event of a 3GB file containing material that is proprietary xAI company information"*. Our client promptly met virtually with a representative of the Insider Threat team on 29 August 2025, and again on 4 September 2025, as referred to in the First 8 September Letter. Our client realised, upon receiving the 28 August 2025 email from the Insider Threat team, that the compressed version of the xAI monorepo remained on his personal device, despite him believing it had been deleted with the rest of the xAI files. He therefore deleted the compressed version without further delay.

8. During the 29 August 2025 meeting, our client confirmed that he had not yet started work at OpenAI, as his last day of employment with xAI was 1 September 2025. He realised, during this meeting, that he had neglected to delete a recording of the xAI All

Hands meeting that had come over at the same time as copying the xAI monorepo. He had missed this document as it was located solely in his downloads folder. He deleted this document in the virtual presence of the Insider Threat team, and pursuant to their instruction; the file was never opened by our client. This was the last of the xAI files to be deleted from our client's personal device.

9. During the 4 September 2025 meeting, our client explained that he was not forthcoming in the 29 August 2025 meeting about the circumstances in which he had copied the xAI file to his personal device. He initially said that he attempted to copy the xAI monorepo without success, such that the file was never transferred to his personal device; this was not correct. Rather, he attempted to copy the xAI monorepo initially, after which it was successfully transferred (and then subsequently deleted). He provided incorrect information to the Insider Threat team during the 29 August meeting, but his intention was not to mislead or to deceive. This was an error of judgment on his part, which he accepts.

10. In the course of preparing this response, it has come to our client's attention that there remains on his personal phone the history of a group chat on the X messaging function used by xAI employees. Use of the X messaging function is, as you will be aware, not confined to xAI employees, however it is used (and was used by our client) by xAI employees in the course of their ordinary work. Our client was removed from this group upon resigning from your client, and he understands that in due course he will need assistance from your client's IT team to permanently delete the history from his personal phone (but for the avoidance of doubt will take no steps to do so for the time being). Our client confirms he has not opened the chat history since resigning from your client, and has not (and will not) attempt to disclose any of its contents to OpenAI or any third party.

11. In response to the relevant background as set out in paragraph 5 of the First 8 September Letter:

11.1 Our client did not take a recording of the xAI All Hands meeting. He was sent the recording contemporaneously by a colleague (see paragraph 5 above).

11.2 It is vehemently denied that our client "*consciously targeted highly valuable code for use at OpenAI*". At no point did our client act with OpenAI's interests in mind; he made an obvious mistake in doing what he did, but he did not act with the intention of providing

any of xAI's confidential information to OpenAI or any other third party (nor has he done so at any point).

**11.3** We note your assertion that xAI's internal security team discovered that our client downloaded xAI material on 27 August 2025. We can see from correspondence between our client and your client's Insider Threat team that they were actually notified on 31 July 2025 i.e. the date of the download itself. A period of four weeks passed before your client contacted our client on the issue. Our client's rights are fully reserved with regards to why your client waited until the very end of his notice period to raise this issue.

**11.4** Our client accepts that he was not at all times honest with your client's Insider Threat team. However, it is not accurate to say that "*he denied transferring any xAI source code to a personal device*". As your client will be aware, he admitted to transferring the xAI source code but did not immediately admit to it successfully making its way onto his personal device. For the avoidance of doubt, our client did not open or otherwise utilise this source code at any point between downloading and deleting it.

*Our client's position*

**12.** Our client knows that he was not permitted to download a copy of the xAI monorepo or the recording of the xAI All Hands meeting, or to make use of them other than in the proper course of his work for xAI. Whilst it is not accurate to say, as you do in the 5 September Letter, that our client stated he became "nervous" about what he had done, he fully admits that he initially did the wrong thing by copying the xAI files over to his personal device, and that subsequently he was not forthcoming in explaining the details of what he did (when questioned), and why. Our client accepts that he made a mistake, and regrets his actions; crucially, however, he did not act at any time with a view to providing any xAI material to OpenAI.

**13.** Given our client's candour in explaining why he did what he did, it follows that we do not accept the "*striking and remarkable coincidence*" you seek to draw between his actions and those of Xuechen Li. In terms of the timing of departures, as your client will be well aware, many more individuals sought to join OpenAI from your client's employment around this time; as is clear from this letter, the circumstances around the actions of both our client and Mr Li and their intentions cannot be compared.

**14.** For the avoidance of doubt, our client fully intends to comply with all ongoing obligations to your client pursuant to both his employment contract, including (but not limited to) the post-termination restrictions set out in Clause 19, but also the confidentiality restrictions set out in the Employee Invention Assignment and Confidentiality Agreement. As has been confirmed to your Insider Threat team, all files belonging to xAI

have been deleted from our client's personal device. At no point between 31 July 2025 and 29 August 2025 (being the date on which the xAI files were transferred and the date on which the last of them were deleted respectively) did our client even open the xAI files, let alone utilise their contents.

*Next steps*

15. It is clear from correspondence between your client's Insider Threat security team and our client that xAI's "Information Security" team can identify when proprietary xAI company information is downloaded onto a personal device (hence why our client was contacted on 28 August 2025). xAI is therefore able to determine: (i) when this occurs, and (ii) in respect of which file. xAI will therefore know that any files downloaded by our client were limited to those referred to above, and to those which our client has confirmed have since been deleted.

16. Nevertheless, our client intends to cooperate with xAI to ensure the swift resolution of this matter. We appreciate that further assurances will need to be given to allay remaining concerns on your client's part in the circumstances, providing that the proposed parameters of such an exercise are proportionate and sensible. Our client is willing to agree to the following, by reference to the First 8 September Letter:

16.1 Our client will agree to enter into undertakings in the form set out at paragraphs 1 and 2 of Schedule A of the draft Consent Order (save for any reference to a "*further Order of the Court*" should be removed);

16.2 Our client will agree to deliver up to your firm all confidential information in his possession (noting, as set out above, that this is limited to the historic X group chat utilised by xAI employees);

16.3 Our client will agree to provide a witness statement, supported by a statement of truth, in the form set out at paragraph 6 of Schedule A of the draft Consent Order by <u>10am on Friday 12 September 2025</u>; and

16.4 Our client will agree in principle to the imaging exercise set out at paragraph 7 of Schedule A of the draft Consent Order to be carried out by an independent third-party IT forensic specialist (with practical details to be decided under separate cover).

17. The combination of the above ought to provide sufficient comfort to your client that its code and its confidential information remains secure. It follows that our client cannot agree to the timeline and steps envisaged at paragraph 12 of the First 8 September Letter:

**17.1**  We do not accept that the aforementioned undertakings need to be provided to the Court, in circumstances where: (i) no claim has been brought, and (ii) our client has agreed to provide a witness statement supported by a statement of truth, which will in turn be supported by the forensic imaging exercise.

**17.2**  Further, it is not clear in respect of what our client would be providing an Acknowledgment of Service by 4pm on Wednesday 10 September 2025. As above, no claim has been brought, and so there is no claim form to acknowledge (nor Defence to prepare 14 days later).

**18.**  Our client has made clear his intention to cooperate with your client to resolve this matter as swiftly as possible, both in his meetings with your client and in this letter. Indeed, he suggested at both meetings that searches be run on his personal device to provide comfort that nothing remained belonging to your client (neither of these suggestions were followed up on at those meetings). This does not mean that we will be providing a signed Consent Order by return, but nor does it mean that our client is "*resiling*" from his earlier position. Your client will hopefully recognise that seeking emergency relief from the High Court will be highly inappropriate given the contents of this letter. Our client's rights are fully reserved in this respect.

**19.**  We confirm that our client has not provided (and will not provide) copies of any xAI code or other confidential information to OpenAI, or to lawyers instructed by OpenAI. We confirm the same in respect of this firm.

**20.**  Finally, and with reference to your requests in the Second 8 September Letter, we can confirm (adopting the numbering in the Second 8 September Letter):

2(a) our client is in the United States temporarily;

2(b) our client's role at Open AI is Member of Technical Staff and his duties involve those of a Software engineer. His role will involve access to, and the creation, modification and review of, OpenAI's codebase.

2(c) we are instructed to accept service of proceedings on behalf of our client in this matter; and

2(d) we are instructed to accept service of proceedings by email on the following basis:

    (a)  Your client must also agree to accept service by email;

(b) Emails must be sent to the following email addresses: Tim.Gilbert@traverssmith.com and Lucy.Chaize@traverssmith.com;

(c) Documents served by email must be in searchable portable document format (PDF), except where agreed otherwise in advance;

(d) Emails which are larger than 50MB in size will not be accepted and in the case of emails which are larger than 50MB in size, service can be effected electronically using a secure file sharing link, which must be sent to the email addresses identified above; and

(e) Any issued Claim Form in relation to this matter may be served by email on the following basis:

  (i) All conditions set out in sub paragraphs (b) to (d) above must be met;

  (ii) This firm must be notified in writing at the email addresses set out above of the date on which the Claim Form will be served by no later than 5pm on the business day before service of the Claim Form; and

  (iii) Rule 6.14 of the Civil Procedure Rules will continue to have effect in relation to service, such that the Claim Form will be deemed as having been served on the second business day after receipt of Travers Smith LLP of the email serving the Claim Form.

Yours faithfully

*Travers Smith LLP*

Travers Smith LLP